IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

EDWARD W. GRANBERRY, JR.,
       Petitioner,

vs.                            Case No.:  5:10cv129/RH/EMT

KENNETH S. TUCKER,[1]
       Respondent.
_____/

## ORDER and REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (doc. 22).  Petitioner filed a reply (doc. 26).

      The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

      The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 22).[2]  Petitioner was charged in the Circuit Court in and for Jackson County, Florida, Case No. 2003-CF-561, with one count of trafficking in cannabis (Count I), one count of

---

[1] Kenneth S. Tucker succeeded Edwin G. Buss as Secretary for the Department of Corrections.  Secretary Tucker is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d)(1).

[2] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 22).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

conspiracy to traffic in cannabis (Count II), and one count of possession of drug paraphernalia (Count III) (Ex. C at 331–32). Petitioner entered a written plea agreement, pursuant to which he agreed to plead guilty as charged in exchange for concurrent sentences of ten (10) years in prison, with a 3-year mandatory minimum, to be followed by ten (10) years of probation on Counts I and II, and time served on Count III (*id.* at 357–58). At a plea and sentencing hearing on September 26, 2005, the trial court accepted the plea and sentenced Petitioner in accordance with the plea agreement (*id.* at 359–75). Petitioner did not directly appeal the judgment of conviction and sentence.

On October 14, 2006, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. D at 1–26). He subsequently filed several amendments (*id.* at 321–33, Ex. C at 1–8). The state circuit court held an evidentiary hearing, at which Petitioner was represented by counsel (Ex. C at 210–323). The state circuit court subsequently denied the Rule 3.850 motion (*id.* at 325–30). Petitioner appealed the decision to the Florida First District Court of Appeal ("First DCA"), Case No. 1D09-781 (Ex. E). The First DCA affirmed the decision per curiam without written opinion on April 30, 2010, with the mandate issuing July 27, 2010 (Exs. G, K). Granberry v. State, 39 So. 3d 322 (Fla. 1st DCA 2010) (Table).

On May 17, 2010, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D10-2528, alleging ineffective assistance of appellate counsel during the Rule 3.850 proceeding (Ex. M). The First DCA denied the petition on the merits on June 21, 2010 (Ex. O). Granberry v. State, 38 So. 3d 839 (Fla. 1st DCA 2010).

Petitioner filed the instant federal habeas action on May 19, 2010 (doc. 1 at 24).

II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.

In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as determined
>> by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in the State court
>> proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams</u>
<u>v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3]  The appropriate test was
described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court
> to grant a state prisoner's application for a writ of habeas corpus with respect to
> claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may
> issue only if one of the following two conditions is satisfied—the state court
> adjudication resulted in a decision that (1) "was contrary to . . . clearly established
> Federal law, as determined by the Supreme Court of the United States," or (2)
> "involved an unreasonable application of . . . clearly established Federal law, as
> determined by the Supreme Court of the United States."  Under the "contrary to"
> clause, a federal habeas court may grant the writ if the state court arrives at a
> conclusion opposite to that reached by this court on a question of law or if the state
> court decides a case differently than this Court has on a set of materially
> indistinguishable facts.  Under the "unreasonable application" clause, a federal
> habeas court may grant the writ if the state court identifies the correct governing legal
> principle from this Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

---

[3] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the
Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529
U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas,
and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was
joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had

before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87 (Jan. 19, 2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291 (citing Harrington, 131 S. Ct. at 786).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* Harrington, 131 S. Ct. at 786; *see also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits

in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see e.g. Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. See Gill, 2010 WL 609844, at *18. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. Id.

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. See Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

III.    EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[4] thereby giving the

_____

[4]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the

State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has provided lower court with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982).  In Anderson, the habeas petitioner was granted relief by the Sixth Circuit Court of Appeals on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which

---

judgment of a State court shall not be granted unless it appears that–
    (A)  the applicant has exhausted the remedies available in the courts of the State; or
    (B) (i)  there is an absence of available State corrective process; or
        (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

"the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." Anderson, 459 U.S. at 7 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  Id., 459 U.S. at 7 and n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  Id.

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[5]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  Duncan, 513 U.S. at 365–66.  More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). In Baldwin, the Supreme Court recognized that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  Id., 541 U.S. at 32.  This language, while not part of the Court's holding, provides helpful instruction.  With regard to this language, the Eleventh Circuit explained in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

---

[5] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.  513 U.S. at 366.

If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"  McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[6]

The Eleventh Circuit, prior to Duncan, had broadly interpreted the "fair presentation" requirement.  After Duncan, however, the Eleventh Circuit has taken a more narrow approach.  For example, in Zeigler v. Crosby, the court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the United States Constitution. 345 F.3d 1300, 1307 (11th Cir. 2003).  The Eleventh Circuit specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words:  "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Due Process Clause of the Florida Constitution.  Id. at 1308 n.5.  The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases.  The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us."  Id.

---

[6] In his initial brief before the Court of Criminal Appeals, McNair cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law."  McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  Id.

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review.  *See* O'Sullivan, 526 U.S. at 839–40, 848; Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* Coleman v. Thompson, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner.  Ford v. Georgia, 498 U.S. 411, 424–25, 111 S. Ct. 850, 858, 112 L. Ed. 2d 935 (1991); Upshaw v. Singletary, 70 F.3d 576, 579 (11th Cir. 1995).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and

expressly state it is relying on state procedural rules to resolve the federal claim.[7]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate. *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default such that the federal habeas court may consider the merits of a claim, the petitioner must show cause and prejudice or a fundamental miscarriage of justice.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  Lack of counsel or ignorance of available procedures is not enough to establish cause.  Tower, 7 F.3d at 210.  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

IV.   PETITIONER'S CLAIMS

A.   Ground One, sub-claim 1-A:  "Petitioner's plea was not voluntarily and intelligently made due to . . . defense counsel's misadvice about sentencing law, discretion of trial court in sentencing Petitioner concurrently as opposed to consecutively."

_____

[7] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541 (11th Cir. 1994).

> Ground One, sub-claim 1-B(a): "Petitioner's plea was not voluntarily and intelligently made due to . . . defense counsel's misadvice about how prior convictions could be used to lengthen the prison term imposed."

> Ground One, sub-claim 1-B(c): "Petitioner's plea was not voluntarily and intelligently made due to . . . defense counsel's misadvice that the Petitioner would receive more prison time than his co-defendant because of his prior record."

In Ground One, sub-claim 1-A, Petitioner asserts defense counsel misadvised him that he could receive consecutive sentences on the trafficking and conspiracy counts, for a total of sixty (60) years, and thus "die in prison" (doc. 1 at 5, 6). He states the law at the time of his offense conduct, September–October of 2003, provided that sentences for such offenses must be run concurrently, because they arose from the same criminal episode (*id.* at 6, citing Vickery v. State, 515 So. 2d 396 (Fla. 1st DCA 1987)). Petitioner states counsel's erroneous advice caused him to enter a guilty plea, and had he known the sentences could not be run consecutively, he would have insisted on going to trial (*id.*).

In Ground One, sub-claim 1-B(a), Petitioner asserts defense counsel misadvised him that his prior convictions could be used to add 6.6 points to the computation of his lowest permissible sentence on his sentencing scoresheet (doc. 1 at 5, 7). Petitioner states his prior convictions of two (2) third degree felonies and one (1) second degree felony were over ten years old and thus could not have been used to increase his minimum sentence (*id.* at 7). He states had he known that his prior record could not have been used to increase his minimum sentence, he would not have entered a plea and would have insisted on going to trial (*id.*).

In Ground One, sub-claim 1-B(c), Petitioner asserts defense counsel misadvised him that if he went to trial, he would receive more prison time than his co-defendant, who was convicted at trial and sentenced to ten (10) years of imprisonment and ten (10) years of probation (doc. 1 at 6, 8). Petitioner states counsel failed to advise him that if a defendant is as culpable or less culpable than a co-defendant, he should not be subjected to a sentence different than the co-defendant (*id.* at 8). He states he would not have pled guilty if he had been correctly informed that his sentence could not be longer than his co-defendant's sentence (*id.* at 8–9).

Petitioner states he raised each of these claims in his Rule 3.850 motion (doc. 1 at 13).

Respondent asserts Petitioner failed to properly exhaust sub-claim 1-A, because he did not raise it in his Rule 3.850 motion or the amendments thereto (doc. 22 at 6–8).  Similarly, as to sub-claim 1-B(a), Respondent contends Petitioner did not fairly present the claim, because he made only a passing reference to it in his Rule 3.850 motion (*id.* at 13–15).  Respondent contends Petitioner may no longer return to state court to litigate either of these claims; therefore, the claims are procedurally barred from federal review (*id.* at 6–8, 14).  Respondent additionally argues notwithstanding the exhaustion issue, Petitioner failed to demonstrate that the state court's adjudication of any of these three claims was contrary to or an unreasonable application of clearly established federal law (*id.* at 8–20).

In Petitioner's reply, he contends he presented all of his claims in his Rule 3.850 motion, at the evidentiary hearing on the motion, and on appeal from the circuit court's denial of relief (doc. 26 at 2–3, 6, 9).  He additionally contends the state court's adjudication of each claim was an unreasonable application of clearly established federal law (*id.* at 3–10, 13–14).

Upon review of the state post-conviction record, the undersigned concludes Petitioner fairly presented each of his claims to the state courts in the Rule 3.850 motion and on appeal of the state circuit court's denial of the motion (*see* Ex. D at 3–16, Ex. C at 210–321, Ex. E at 16–24).

1.      Clearly Established Federal Law

When a defendant challenges his plea based upon allegations of ineffective assistance of counsel, the two-prong standard set forth in Strickland v. Washington, 466 U.S. 668 (1984) applies.  *See* Hill v. Lockhart, 474 U.S. 52, 58, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985).  To obtain relief under Strickland, Petitioner must establish:  (1) that his counsel's representation "fell below an objective standard of reasonableness," and (2) that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  466 U.S. at 688.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697; Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

The focus of inquiry under the performance prong of the Strickland standard is whether counsel's assistance was "reasonable considering all the circumstances." *See* Strickland, 466 U.S. at 691. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Indeed, the Supreme Court warned about second-guessing professional judgments made by counsel:

> [T]he decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. Counsel must predict how the facts, as he understands them, would be viewed by a court. . . . Questions like these cannot be answered with certitude; yet a decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be. Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts. That a guilty plea must be intelligently made is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing.

McMann v. Richardson, 397 U.S. 759, 769–70, 90 S. Ct. 1441, 1448, 25 L. Ed. 2d 763 (1970).

In a plea situation, counsel must provide advice "within the range of competence demanded of attorneys in criminal cases." Hill, 474 U.S. at 56–57 (quoting McMann, 397 U.S. at 771). Under this standard, representation is ineffective only if counsel commits "serious derelictions" of his duty when advising the accused. Stano v. Dugger, 921 F.2d 1125, 1150–51 (11th Cir. 1991). Absent such blatant errors, however, the court should "indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." Yordan v. Dugger, 909 F.2d 474, 477 (11th Cir. 1990). The Eleventh Circuit has commented that "[t]he right to competent plea bargain advice is at best a privilege that confers no certain benefit," because a defendant "may make a wise decision" without assistance of counsel or a "bad one despite superior advice from his lawyer." Wofford v. Wainwright, 748 F.2d 1505, 1508 (11th Cir. 1984) (per curiam). "[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the

former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between [entering a plea] and going to trial." *Id.* This requires counsel to "offer his informed opinion as to the best course to be followed" and impart "a general knowledge of the possible legal consequences of facing trial" to the defendant. *Id.* Therefore, a defendant's failure to "correctly assess every relevant factor entering into his decision" does not undermine a validly entered guilty plea. *Id.* at 1509.

To meet the prejudice prong of the Strickland standard in a plea situation, Petitioner must establish that prove that "counsel's constitutionally ineffective performance affected the outcome of the plea process." Hill, 474 U.S. at 59. Often this analysis hinges upon whether eradication of the error would have led counsel to change his recommendation as to the plea, which in turn generally depends on whether the outcome of a trial would have been substantively different. *Id.* at 59–60. While counsel can be deemed ineffective under Strickland for failing to provide proper advice during the plea process, Petitioner must demonstrate a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial. *See* Diaz v. United States, 930 F.2d 832, 835 (11th Cir. 1991); Toro v. Fairman, 940 F.2d 1065, 1068 (7th Cir. 1991). A conclusory, after-the-fact statement that Petitioner would not have pled guilty, without more, is insufficient to establish prejudice under Strickland. *See* Diaz, 930 F.2d at 835; *see also* Coulter v. Herring, 60 F.3d 1499, 1504 (11th Cir. 1995) (though Coulter evidenced, through his counteroffer to the state, a willingness to enter into a plea agreement, he offered no further proof to show that he would have accepted the state's plea offer of life without parole absent his lawyers' alleged errors; therefore, Coulter failed to establish any prejudice stemming from counsel's alleged deficient performance); Johnson v. Duckworth, 793 F.2d 898, 902 n.3 (7th Cir. 1986).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).

2.      Federal Review of State Court Decision

Petitioner raised his claims in Grounds One in his Rule 3.850 motion.  In the state circuit court's written decision, the court correctly cited the two-prong Strickland standard as the applicable legal standard (Ex. C at 327).  The state circuit court adjudicated the claims as follows:

> In claim one, Defendant alleges that his plea was not voluntarily entered when he waived his right to appeal.  In support, Defendant submits that counsel was ineffective by misadvising him as to the probable sentence he would receive if convicted by a jury at trial.  In addition, Defendant asserts that his defense counsel was incorrect in advising him that due to his prior criminal record that he would receive a longer prison sentence than his co-defendant, who did not have the same lengthy and extensive criminal history.  Defendant's claim is refuted by the record. _See Transcript of Plea and Sentencing Colloquy held September 26, 2005, pgs. 5–8._
>
> Despite the foregoing, Defendant ignores the discretionary nature of the sentencing Court's authority as well as the simple fact that the sentencing judge may consider anything relevant to the sentencing decision, including but not limited to letters from interested parties, witness testimony during the proceeding, and at the very least, the Defendant's prior criminal history.
>
> During the evidentiary hearing, Defendant's trial counsel stated that Defendant knew the plea deal he was about to enter into on September 26, 2005.  Counsel went into great detail based upon his notes that showed a back and forth communication and negotiation the weekend before the plea of conversations between the prosecutor, Defendant and trial counsel.  In fact, counsel's training and experience indicated that this was a good deal for Defendant because he could get a lot more time than his co-defendant.  According to counsel's notes from his file, he testified that he had informed Defendant about the possible maximum sentence he could receive if he was convicted at trial, which was a total of sixty-one years in prison.  Moreover, counsel stated that he sent a copy of a score sheet to Defendant that showed he could receive a maximum of sixty years in prison.  Based upon the foregoing, Defendant's claim is denied.

(Ex. C at 325–26).

Petitioner appealed the state circuit court's decision to the First DCA.  The appellate court affirmed per curiam without written opinion.  As previously discussed, when faced with a state appellate court's summary affirmance of a trial court's decision, the "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  _See_ Gill, 633 F.3d at 1287 (citing Harrington, 131 S. Ct. at 786).  The federal court must determine what

arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* Harrington, 131 S. Ct. at 786; *see also* Gill, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

In the instant case, the state court's factual findings as to the information defense counsel provided to Petitioner regarding the possible sentence he could receive if he was convicted at trial, including a possible maximum sentence of sixty-one (61) years in prison and the effect of his prior criminal record, are supported by the record. At the evidentiary hearing, Petitioner's trial counsel, Mr. Komarek, testified he had been a member of The Florida Bar since 1975 (Ex. C at 288). He testified that approximately sixty (60) percent of his caseload was criminal, and he was a board-certified criminal trial attorney (*id.* at 288–89). He testified Petitioner had a reasonable chance of success at trial, until his co-defendant, Mr. Richter, was convicted of the same charges and agreed to testify against Petitioner (*id.* at 289–91). He testified he sent a copy of Petitioner's sentencing scoresheet to Petitioner on August 23, 2005, over one month prior to the plea hearing (*id.* at 289). The scoresheet included five prior convictions for possession of marijuana, sale or manufacture of marijuana, and transmitting contraband (*id.* at 376–78). Those prior convictions contributed 6.6 points to the computation of Petitioner's lowest permissible prison sentence of 47.1 months (*id.*). The scoresheet indicated the statutory maximum sentence Petitioner could receive was sixty (60) years in prison (*id.*). Komarek testified that on September 23, three days prior to jury selection in Petitioner's case, a series of conversations occurred between him, Petitioner, and the prosecutor (*id.* at 291–93). Komarek testified the prosecutor notified him that Mr. Richter would testify at Petitioner's trial and described the content of his testimony (*id.* at 293). Additionally, the prosecutor informed Komarek that Mr. Richter received a sentence of ten (10) years of imprisonment and ten (10) years of probation, and he had no prior criminal history (*id.* at 293–94). The prosecutor offered

Petitioner fifteen (15) years of imprisonment, with a three-year mandatory minimum (*id.*). Komarek testified he immediately called Petitioner and conveyed the prosecutor's offer (*id.* at 293). Mr. Komarek testified he explained to Petitioner that he had thirty (30) years of exposure on the trafficking charge, thirty (30) years on the conspiracy charge, and one year on the paraphernalia charge, for a total of sixty-one (61) years (*id.* at 294). Komarek testified he told Petitioner he would actually serve 85% of whatever sentence he received (*id.*). Komarek testified he did not recall whether he actually told Petitioner he could die in prison, but because Petitioner was fifty (50) years old, and he could be sentenced anywhere between three (3) and sixty (60) years, Petitioner needed to know what his risk was, and if he made a mistake he could get substantially more than his co-defendant (*id.* at 292, 311–12). Komarek testified, "And since he's telling me . . . he's got post-traumatic stress disorder and all the medications he's taking, I think it needed to be crystal clear in real life terms what his decision involved." (*id.* at 312). Mr. Komarek further testified he may have told Petitioner he was "looking at" a harsher sentence than Mr. Richter, and he may have done so because he believed Petitioner would receive a harsher sentence based upon his prior criminal record (*id.* at 295–96). Komarek testified that Petitioner responded on September 24, and stated he would plead to ten (10) years of imprisonment, the same probation that Mr. Richter received, and fines (*id.* at 295). Komarek spoke again with the prosecutor and relayed the counter-offer (*id.* at 294). The prosecutor eventually agreed to the ten-year sentence with ten years of probation, and fines (*id.*). Komarek contacted Petitioner, and Petitioner confirmed he would accept the plea on those terms (*id.* at 295).

Petitioner admitted at the evidentiary hearing that he knew, prior to entering his plea, that the maximum sentence he could receive was sixty (60) years of imprisonment, thirty (30) years on each charge (Ex. C at 267). He also admitted he had five (5) prior felonies: a conviction for possession of marijuana in 1981, for which he received a three-year sentence; a conviction for possession of marijuana with intent to sell in 1981, for which he received a three-year sentence; a conviction for possession of marijuana and a conviction for promoting prison contraband in 1984, for which he received two (2) years of imprisonment and eight (8) years of probation; and a conviction for possession of marijuana in 1992, for which he received fifteen (15) years in prison, but was required

to serve only three (*id.* at 244–46).  Petitioner also admitted he knew, pre-plea, that his co-defendant, Mr. Richter, had been convicted at trial and sentenced to ten (10) years in prison (*id.* at 246).

Under Florida law, the maximum sentence Petitioner could receive on the possession of paraphernalia charge, a first degree misdemeanor, was one (1) year.  *See* Fla. Stat. §§ 893.147(1)(a), 775.082(4)(a).  The maximum sentence Petitioner could receive for the trafficking charge, a first degree felony, was a term of imprisonment not exceeding 30 years, with a three-year mandatory minimum term of imprisonment.  *See* Fla. Stat. §§ 893.135(1)(a)1., 775.082(3)(b).  The maximum sentence he could receive for the conspiracy to traffic charge, also a first degree felony, was a term of imprisonment not exceeding 30 years, with a three-year mandatory minimum term of imprisonment.  *See* Fla. Stat. §§ 893.135(5), 775.082(3)(b).  The conspiracy section of the drug trafficking statutes expressly authorizes separate convictions and sentences for trafficking and conspiracy to traffic.  *See* Fla. Stat. § 893.135(5).  Moreover, Florida law expressly provides that a court may impose consecutive sentences for acts committed in the course of one criminal transaction or episode but which constitute one or more separate criminal offenses.  *See* Fla. Stat. § 775.021(4)(a).  Based upon Florida law, defense counsel correctly advised Petitioner that if he was convicted at trial, he could receive consecutive 30-year sentences for the trafficking and conspiracy counts.

Petitioner's reliance upon Vickery v. State, to demonstrate error with respect to counsel's advice that the sentences for trafficking and conspiracy could be run consecutively, is misplaced.  In Vickery, the court held that consecutive mandatory minimum sentences for multiple offenses which occurred during a single criminal episode is impermissible.  515 So. 2d 396 (Fla. 1st DCA 1987) (emphasis added).  Vickery did not hold that consecutive sentences for multiple offenses which occurred during a single criminal episode is impermissible.  Therefore, Petitioner failed to show that defense counsel's advice as to his maximum sentence exposure if he went to trial was erroneous.

Additionally, defense counsel correctly advised Petitioner that if he went to trial and was convicted, the trial court could consider his five prior felonies in imposing sentence.  Florida's Criminal Punishment Code provides, in relevant part:

(14) "Prior record" refers to any conviction for an offense committed by the offender prior to the commission of the primary offense. Prior record includes convictions for offenses committed by the offender as an adult or as a juvenile, convictions by federal, out of state, military, or foreign courts and convictions for violations of county or municipal ordinances that incorporate by reference a penalty under state law. Federal, out of state, military or foreign convictions are scored at the severity level at which the analogous or parallel Florida crime is located.

(A) Convictions for offenses committed more than 10 years before the date of the commission of the primary offense must not be scored as prior record <u>if the offender has not been convicted of any other crime for a period of 10 consecutive years from the most recent date of release from confinement, supervision, or other sanction, whichever is later, to the date of the commission of the primary offense.</u>

Fla. R. Crim P. 3.704(14) (emphasis added). In the instant case, Petitioner's offense conduct occurred on October 2, 2003, at the latest (Ex. C at 331–32). He admitted at the evidentiary hearing that he was convicted of a felony in 1992 and served three (3) years in prison, which would have brought his release date within ten (10) years of the date of commission of his instant offense (*id.* at 245). Therefore, all of his prior convictions were properly scored on his sentencing scoresheet. Further, as the post-conviction court noted, in imposing sentence, the sentencing court had discretion to consider anything relevant to the sentencing decision, including Petitioner's prior felonies. Petitioner thus failed to show that defense counsel gave him incorrect advice on the issue of the sentencing court's ability to consider his prior criminal history.

Finally, counsel reasonably advised Petitioner that if he went to trial and was convicted, he would receive a harsher sentence than his co-defendant. A defendant's criminal history is used to compute a defendant's lowest permissible prison sentence under Florida's Criminal Punishment Code, and it is a factor that may be considered by the court in determining the sentence. In this case, Petitioner's co-defendant went to trial first, was convicted of the same charges with which Petitioner was charged, and was sentenced to ten (10) years in prison, <u>without a prior criminal history</u>. It was therefore reasonable for defense counsel to advise Petitioner that he would receive a longer sentence than his co-defendant, based upon Petitioner's criminal history.

In light of the record, the state court reasonably concluded that Petitioner failed to demonstrate his plea was unknowing and involuntary due to misadvice by defense counsel regarding

his sentence exposure.  Therefore, Petitioner failed to demonstrate that the state court's adjudication of Ground One, sub-claims 1A, 1B(a) and 1B(c) was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of <u>Strickland</u>.  Accordingly, he is not entitled to habeas relief on any of these claims.

      B.    <u>Ground One, sub-claim 1-B(b):  "Petitioner's plea was not voluntarily and intelligently made due to: . . . defense counsel's misadvice that if Petitioner testified, the prosecutor could cross-examine him about the nature of his prior convictions."</u>

Petitioner asserts defense counsel advised him that if he went to trial and testified, the prosecutor would be able to "expound on" Petitioner's prior marijuana convictions, and the jury would learn the nature of those convictions (doc. 1 at 6, 7–8).  Petitioner states had counsel not misadvised him, there is a reasonable probability he would have insisted on going to trial (*id.* at 8).  Petitioner states he raised this claim as Issue 4 in his Rule 3.850 motion and in his brief on appeal (doc. 1 at 13; doc. 26 at 10).

Respondent contends Petitioner never raised this claim in the state courts; therefore, the claim is unexhausted and procedurally barred (doc. 22 at 16).

Review of the record demonstrates Petitioner raised this claim as Issue 4 in his Rule 3.850 motion (Ex. D at 327–31).  The state circuit court denied the claim (Ex. C at 327–38), and Petitioner raised the issue on appeal of the circuit court's decision (Ex. E at 35–40).  Therefore, the claim was properly exhausted.

      1.    Clearly Established Federal Law

The clearly established law governing this claim is set forth *supra*.

      2.    Federal Review of State Court Decision

The state circuit court adjudicated the claim as follows, in relevant part:

> In claim four, Defendant alleges that counsel's advice to him not to testify because of the damaging effects Defendant's prior convictions would have on the credibility of the testimony [sic].  In support of this claim, Defendant submits that the possibility of him testifying at trial was discussed with counsel.  In these discussions, Defendant states that he was told by counsel to the effect that, should he testify, the prosecutor would be allowed to tell the jury all about his prior convictions and that there would be nothing he could do to stop it.  Since the Defendant had numerous marijuana related prior convictions, he was concerned about the adverse effect such information would have on the jury in this marijuana related prosecution.

> Specifically, it was not the number of prior convictions, but their nature, that the Defendant feared would prejudice the jury against him. Based upon this information, the Defendant waived his right to jury trial and entered the plea. _See Defendant's Motion filed March 19, 2007, pg. 2._
>
> . . . .
>
> At the evidentiary hearing, trial counsel stated that any decision to testify or not at trial was for the Defendant to make based upon counsel's advice. However, counsel stated that he never made a recommendation about Defendant testifying because it would be a last minute decision as the trial progressed. In fact, counsel stated that he never had a discussion about how the State could use the prior felony convictions against him because it was not time yet. However, counsel stated that it would be his common practice to inform a client about how prior convictions could be used when a client takes the stand.

(Ex. C at 327–28).  The court denied the claim on the ground that Petitioner failed to demonstrate prejudice under Strickland.  As previously noted, the appellate court affirmed per curiam without written opinion.

The First DCA's affirmance could have been based upon the argument that Petitioner failed to demonstrate deficient performance by counsel.  At the evidentiary hearing, Mr. Komarek testified as follows on this issue:

> . . . we did have a conference, before we were notified that Mr. Richter was going to be a witness, going over just things in general, including changes in venue and things like that. I can't say I ever thought that, or told him that we would probably win, because that doesn't sound like something I would say. However, we probably had a defensible case, which is better than some. The problem was he had so much exposure and he had so many prior convictions. I don't know that I went into all the details with regard to the technique of impeachment or not when I was speaking. I had never sat down and asked him, nor had he told me exactly what his trial testimony was going to consist of, because I usually leave that door open until the very last minute to make my recommendation. In his case, even the week before the trial we didn't go over that, because that's when I got the notice that Mr. Richter was going to testify.
>
> . . . .
>
> And then that's when a series of conversations back and forth between me and you [the prosecutor], and you and me, and Mr. Granberry and back and forth began all through that weekend. You contacted me on the 23rd, the same day that the notice of the additional witness came, indicating that . . . probably my client did not qualify for habitual offender because of the distance in the past, over five years, of his last conviction. However, those really weren't convictions. That last, those last charges, as I recall, adjudication of guilt was withheld, but he had some older charges

than that, which would have caused a problem at trial.  And they all would've caused a trial [sic] if he would've, would've [sic] caused a problem if he would have been convicted because Judge McClellan would've known about his prior criminal record, regardless of whether adjudication was withheld or anything.  And he would've known what the nature of the charges were.  So, the judge would've been fully informed as to what he, his previous convictions or withholds would've been if there would've been a conviction.

. . . .

Q [by the prosecutor].  . . . Now let's move down to the fourth issue, sir.  Did you advise the defendant not to testify because of his prior convictions?

A.  No, because I left the door open for my recommendation.  It's his right not to testify or not [sic], over my recommendation.  But I left the door open to get to that until the last minute because I always leave it to the last minute, usually, unless there's something that forces it earlier.  And then when I get the individual in my office or somewhere else one on one, I'll ask him, if you're under oath in this case and you're going to testify on your defense, what's your testimony going to be, so that I can evaluate whether I should say, well, you've got a problem or if it's, if I know that it's going to be perjury, then there's certain things that I have to do and I advise them about it.  Hypothetically, I might have been discussing with him in advance the, what the lawyer's obligation is if there's a possibility of perjury, but that was hypothetical.

. . . .

But I didn't really sit down and quiz him about what his actual testimony was going to be because he wouldn't have had the benefit of what Richter was going to say yet.  So that door was still open, as far as I was concerned, until after I got a deposition of Mr. Richter and then told him, here's what everybody's saying, here's what everybody's doing, here's what they have.  If you're a witness, what are you going to testify to?

. . . .

I don't think I ever did discuss with him, as he indicated, the manner in which the State could use criminal convictions on an individual.  I never got to that specific point, because, again, his actual testimony, we hadn't got to that last minute decision making and recommendation yet.  I would have talked to him about it at that time, because you'd have, he would have to be very cautious.  He had some convictions where there was a withhold and then he had those older convictions, which apparently you knew about, but I didn't know that you knew, from Alabama.  And if he made a mistake on the number of the convictions, because of pressure or stress or something like that, then you would be able to get into the details to some extent.  That's my understanding of the law.  If I'm wrong, then I'm wrong.  But my understanding is, to refresh his recollection, you could get into the details if he misstated the number.  And he had some older ones where he was adjudicated—I

think three—and then he had some newer ones.  Two, I think two felonies, maybe, were adjudication withheld.  If he got confused on the stand, it could be bad.

. . . .

But we, but he and I never had that discussion.  I just knew that.

Q [by Petitioner's counsel].  . . . you never did say specifically, this is how they can ask the question procedurally, you know:  how many pri–, have you ever been convicted of a felony and how many times?  You never talked about that?

A.  No, we didn't.  Because if you go into that too much in advance, you've got to do it all over again anyway, because they don't remember.

. . . .

Q.  And do you, in your experience, your trial experience, what I would do is I would go to the State prior to that and say, how may convictions does he actually have . . . .  Did you ever, did you do that practice where you make sure that you know what the State is looking at as far as the number of convictions he had?

A.  Yes.

Q.  Okay.  And you could have done that in that —

A.  Could have.

. . . .

Didn't get to the point where it was, had done it.

Q.    I'm just addressing the concern, you know, when he said, well, if you got nervous on the stand, then he could, the numbers could go wrong.  But you could actually go to Mr. Basford [the prosecutor] and say, how many has he got?  Five.  Mr. Granberry, you've got five convictions, that's what the State's saying, do you agree or disagree with that, prior to him getting on the stand?

A.  That's correct.

Q.  Okay.  And you do that?

A.  Yes.

(Ex. C at 290–92, 299–301, 308–09).

At the evidentiary hearing, Petitioner did <u>not</u> testify that Mr. Komarek affirmatively advised him that the jury would learn the nature of his prior convictions if he testified at trial.  He testified as follows:

Q [by Petitioner's counsel].  . . . was there ever any discussion regarding the things that the State could bring out if you in fact did testify?

A.  Well, it—well, just the letter he sent me.

Q.  Okay.

A.  There's a letter that he said they could, they would use my priors against me.
. . . .
And that was really all I got there.  I didn't know, I thought they could go in depth, in detail, you know, and drag up, you know.

Q.  During the trial?

A.  Yes, sir.

Q.  And when you say they could go in depth, in detail, what, what, tell—just tell the Court, you had a prior criminal history, right?

A.  Yes, sir.

Q.  And you had drug charges before?

A.  Yes, sir, it was, yes, the marijuana charges.

Q.  Okay.  What did you think, when he said that, what that meant?

A.  Well, I thought they would just, well, tear up my credibility or any kind of, you know, he would use that to impeach me.

Q.  Okay, all right.  Did he give you any specifics of how they would impeach you with your criminal history that you can recall?  Any specifics?

A.  No, sir.

Q.  Okay.  So, again, you just thought they's just bring up all the facts?

A.  Yes, sir, just, just really the basic thing was that letter saying that they could, you know, because of my priors, I'd get a harsher sentence.

Q.  Okay, all right.  Now, when he said that you could get a harsher sentence because of your priors, was there any other explanation, other than—did he say anything else?

A.  No, sir, like I say, that was in that letter and I really didn't, we didn't discuss anything more.

Q.  How did you, how did you take that?

A.  Well, I would get more than, more than Richter got.  I mean, they could use my priors against me and give me more time.  I really didn't know how, but, you know, I was looking at more time.

. . . .

Q.  Were you concerned that those could come up and, too, enhance your sentence?

A.  Yes, sir.  Yes, sir.

Q.  Okay.

A.  I didn't know how they would be used, but I knew they could be used.

. . . .

Q.  And I believe you already testified that it would actually be the facts you thought might even come out in the trial?

A.  Yes, sir.

. . . .

Q [by the prosecutor].  . . . when you found out that Richter . . . was in fact going to testify against you, all right, was there any discussion then about whether or not your [sic] would testify at your trial?

A.  Yes, sir.

. . . .

He still didn't want me to testify.

Q.  All right.  And the reason was?

A.  I don't know.

Q.  You don't know?  Because your prior record could come up—

A.  Yes, sir.  Yes, sir.

Q. —about your five felony convictions?

A. Yes, sir.

Q. Didn't he tell you that?

A. Yes, sir, he did.

Q. Do you know now that that is true, that the State could have impeached your testimony and brought up evidence that you were convicted of a felon [sic], of a felony five time [sic] before?

A. Yes, sir.

Q. Okay. So that was true, right?

A. Yes, sir.

. . . .

Q. . . . When he [Mr. Komarek] told you that they could use your prior record against you, you say he didn't give you any specifics?

A. No, sir.

(Ex. C at 224–27, 249, 253). The letter referenced by Petitioner was admitted into evidence at the evidentiary hearing (*see id.* at 265–66, Ex. D at 95). The letter, dated August 9, 2005, stated:

Mr. Basford is pressing for trial now that Mr. Richter has been convicted and received ten years at the Department of Corrections. He rejected my attempts to get probation and/or preserve our Motion for Dismissal for appeal. He suggests that due to your prior convictions, you stand to receive a longer sentence than Richter. He will let you plead to ten years.

I pass this information along to you since I am obliged to pass on all plea negotiations.

(Ex. D at 95).

There is no evidence that counsel provided incorrect advice as to the manner in which the State could use Petitioner's prior convictions to impeach his credibility if he testified.[8]   While

---

[8] Florida Statutes section 90.610 provides that a party may attack the credibility of any witness, including the accused, by evidence of a prior felony conviction. Fla. Stat. § 90.610 (2003). Unless the witness answers untruthfully, this inquiry is generally restricted to the existence of prior convictions and the number of convictions. Fotopoulos v.

Petitioner may have believed that the State could have revealed the nature of his prior convictions to the jury, there was absolutely no evidence adduced at the evidentiary hearing suggesting that Petitioner's erroneous belief was based upon affirmative misadvice from counsel. Moreover, counsel's practice of reserving in-depth discussions of the details involved in a client's decision whether to testify, including advice concerning the State's use of prior convictions as impeachment, until nearer the time when the decision must be made and all of the trial witnesses's testimony is known, falls within the wide range of reasonably professional assistance. Therefore, Petitioner failed to demonstrate defense counsel performed unreasonably with regard to advising him about the State's ability to use prior convictions as impeachment.

Petitioner failed to demonstrate that the state court's adjudication this claim was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of Strickland. Therefore, he is not entitled to relief on Ground One, sub-claim 1-B(b).

C.      Ground One, sub-claim 1-C: "Petitioner's plea was not voluntarily and intelligently made due to: . . . defense counsel's coercion, threat to withdraw if Petitioner did not accept plea."

Petitioner asserts defense counsel threatened to withdraw from the case if Petitioner chose to testify and rejected the State's plea offer (doc. 1 at 9). He states he raised this claim in his Rule 3.850 motion (*id.* at 13).

Respondent contends Petitioner failed to demonstrate that the state court's adjudication of the claim was contrary to or an unreasonable application of Strickland (doc. 22 at 20–21).

1.      Clearly Established Federal Law

The clearly established law governing this claim is set forth *supra*.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Issue 5 in his Rule 3.850 motion (Ex. D at 331–32). The state circuit court adjudicated the claim as follows:

> In claim five, Defendant alleges that counsel lead [sic] him to believe that he would withdraw from the case if Defendant testified at trial. Specifically, Defendant alleges that defense counsel told him "to the effect, should the defendant testify, he

State, 608 So. 2d 784, 791 (Fla. 1992) (citations omitted)

no longer would be able to defend him." *See Defendant's Motion filed March 19, 2007, pg. 7.* As a result, Defendant submits that counsel's statements interfered with his right to testify by a threat to withdraw, which constitutes ineffective assistance of counsel.

During the evidentiary hearing, Defendant's counsel stated that he never told his client that he would withdraw from the case if he elected to testify. Rather, counsel believed that his client was confused and/or mixed up about a hypothetical situation dealing with Defendant testifying truthfully and not committing perjury, if he took the stand. However, counsel also stated that it was too early in the proceedings for counsel to make any recommendation about Defendant testifying because the trial had not yet commenced. As previously explained in claim four above, counsel stated that he never made a recommendation about Defendant testifying because it would be a last minute decision as the trial progressed.

In comparison, when Defendant was questioned by the assistant state attorney concerning the hypothetical situation, he denied any knowledge about counsel informing him that he would have to withdraw if the Defendant committed perjury while on the stand. Instead, Defendant stated that he wanted to testify when he learned that his co-defendant Jeffery Scott Richter, who was convicted earlier by a jury, would be called on behalf of the State as a witness. However, the substance of the Defendant's testimony presented at the hearing would not have created a reasonable probability that the testimony would have created reasonable doubt. Rather, Defendant's testimony would do no more than rebut the testimony of the State's witnesses, which is not enough to fulfill the prejudice prong of *Strickland*. *See also, Jackson* [*v. State*, 711 So. 2d 1371, 1373 n.1 (Fla. 4th DCA 1998)].

In essence, Defendant's allegation is that his plea was not voluntarily entered and he was coerced by threats of trial counsel, that if he did not accept the State's plea offer, counsel would abandon him. However, Defendant has failed to establish prejudice based on his decision not to testify, as required by the *Strickland* test. *See also Knauff v. State,* 941 So. 2d 1242, 1243 (fn. #1) (Fla. 5th DCA 2006). According to the plea transcript, the Defendant's plea was voluntarily entered into with the advice of counsel. *See TR Plea and Sentencing Colloquy, pgs. 5–8.* Moreover, Defendant acknowledged that nobody promised or threatened him in any way to get him to enter this plea. *See TR pg. 6, lines 19–21.* In addition, Defendant affirmed that he was satisfied with the services of his attorney. *See TR pg. 6, lines 11–12.* Finally, trial counsel's testimony at the evidentiary hearing is consistent with the plea transcript that Defendant's plea was freely and voluntarily entered into on September 26, 2005. Based upon the foregoing, defendant's claim is denied.

(Ex. C at 328–29).

"Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011); see also Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing Rice v. Collins, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")).   Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 434, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983); see also Baldwin v. Johnson, 152 F.3d 1304, 1317 (11th Cir. 1998); Smith v. Kemp, 715 F.2d 1459, 1465 (11th  Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing.").   Questions of the credibility and demeanor of a witness are questions of fact. See Consalvo, supra (citing Freund v. Butterworth, 165 F.3d 839, 862 (11th Cir. 1999) (en banc)).   The AEDPA affords a presumption of correctness to a factual determination made by a state court; the habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence. See 28 U.S.C. § 2254(e).

At the state post-conviction evidentiary hearing, the state court credited the testimony of defense counsel, Mr. Komarek.   As previously noted, Mr. Komarek testified that beginning Friday, September 23, 2005, and continuing over the weekend, he had several plea discussions with the prosecutor and Petitioner (Ex. C at 291–96).   He testified as follows:

A. . . . . I'm going back to your [the prosecutor's] call to me on the 23rd of September, 2005.  After you got done talking about that you didn't think he'd qualify for habitual offender, my notes indicate that you offered fifteen years imprisonment.

Q [by the prosecutor].  Now, this was for a plea?

A. Yes, for plea purposes. . . . I think I'd indicated either truthfully or as part of my position at that time that he might not want to take that.  There was a [mandatory] minimum of three [years]. . . . Right after that I called Mr. Granberry

about the plea offer.  I conveyed it to him, fifteen years with a three-year minimum mandatory.  I think he was thinking about it. . . .

. . . .

        . . . I explain [sic] to him that he's got thirty, thirty years on the trafficking charge, thirty on the conspiracy to traffic and the paraphernalia, so basically, sixty-one years if you add them all together, that eight-five percent of the time is what he would be doing.  He's only got one ground to appeal right now and that would be the search warrant.  There must have been some discussion about how to preserve that issue because you wouldn't take a plea where he could preserve it.  And we discussed, or I told him about pleading straight up, just pleading to the charges and say that we wanted to preserve the appeal and, if we were allowed to do that by the judge, then that might work.

        Q.  That would be pleading straight up to the Court with no plea agreement with the State?

        A.  Right, and if the—yeah, right.  And, of course, announcing to the Court that that was based upon or conditioned upon him being able to preserve his right to appeal.  And it might work and it might not.  And I explained to him, after conversations with you . . . [i]f we could get ten years and do the deal, he'll do it.  That's when he told me about being shot bothered him on his left side, post-traumatic stress, medications.  He's taking medications:  Xanex and Lexapro and his blood pressure medication and so forth.  But he didn't give any indication that it affected him.

        Now, I'm jumping from the 23rd back to the 24th again on my notes.  That's where I talked to him and he indicates that he'll plead ten years, same probation Richter got, the fines and so forth.  And he says okay, or at least my notes indicate that he confirmed that he would do that.  It was all rather non-specific in detail because we're going back and forth and everything is not mentioned every time, because we're assuming at that point that it's going to be basically the same thing that Richter got and that you wouldn't, you wouldn't allow him to preserve his right to appeal.

. . . .

        So, to the best of my knowledge, when we went in Monday morning, he knew what the deal was.

. . . .

        Q.  And to your knowledge, sir, did he understand what the deal was going to be before he came into the courtroom that morning?

        A.  Yes.

Q.  And was his plea freely and voluntarily entered to your knowledge, sir?

A.  To my knowledge, it was.

. . . .

. . . I left the door open for my recommendation [as to whether Petitioner should testify].  It's his right not to testify or not [sic], over my recommendation.  But I left the door open to get to that until the last minute because I always leave it to the last minute, usually, unless there's something that forces it earlier.  And when I get the individual in my office or somewhere else one on one, I'll ask him, if you're under oath in this case and you're going to testify on your defense, what's your testimony going to be, so that I can evaluate whether I should say, well, you've got a problem or if it's, if I know that it's going to be perjury, then there's certain things that I have to do and I advise them about it.  Hypothetically, I might have been discussing with him in advance the, what the lawyer's obligation is if there's a possibility of perjury, but that was hypothetical.

. . . .

But I didn't really sit down and quiz him about what his actual testimony was going to be because he wouldn't have had the benefit of what Richter was going to say yet.  So that door was still open, as far as I was concerned, until after I got a deposition of Mr. Richter and then told him, here's what everybody's saying . . . if you're a witness, what are you going to testify to?

Q.  All right.  And finally, sir, as to Ground 5, the allegation that counsel indicated he would withdraw if the defendant testified.  Again, did you ever tell him, I will withdraw or I will not represent you if you testify in this manner?

A.  No, I think he's got, probably, the hypothetical mixed up with something else.  Because we weren't at the point where I would recommend that he testify or not and I was just giving him the hypothetical about what a lawyer's obligation is.  And, even then, the Judge says, you know, they're not going to let us withdraw.  You have to make the motion and go back in chambers and you're not there and then we go out and we have to go do what the Florida Bar says we have to do, but I'm not going to be able to withdraw.  But we never got to that point and I wouldn't have told a client that if he testifies, I'm going to withdraw.  Not in those terms, not that way.

. . . .

Q [by Petitioner's counsel].  Did you ever, after you'd gotten the ten-year deal, did he ever come back and say, no, I do not want to take that deal?

A.  No, sir.

. . . .

Q.  Okay.  And you also said and your testimony, I believe, is that you never got to the point of actually discussing whether or not he should testify; you wait till the last minute in trial prep to do that?

A.  We never got to the point where I would recommend that he testify or that he not testify.

Q.  Okay.  Do you recall ever . . . it coming up that he says, you know, Richter's not telling the truth or whatever he's going to say or if he says I'm the head of this or I'm the instigator, . . . Did he ever say, no, I can get up there and I can testify and he's not being honest about this? . . .

A.  I never heard that comment, that I recall.

. . . .

. . . he never told me that.

Q.  . . . And I'm just wondering does your notes [sic] reflect, at any point in time, that they [Petitioner and his wife] changed their mind even for a ten-year sentence and now we're going to go to trial, they want to go to trial on this?

A.  No.

. . . .

My last note here on the matter is talking with him, Mr. Granberry, and at nine a.m. to plead guilty, ten years in prison plus Richter's package . . . . then I have a dash . . . in parentheses, "defendant."

. . . .

So, that's my last note, is that he okays what we're going to do, and I understand that he understands.

. . . .

Q.  . . . did you ever say the words that I couldn't represent you or I can't defend you, at any, during this weekend, out of any context or conversation that y'all would have been having?

A.  That doesn't sound to me like something I would ever say.  I don't ever remember saying it to anybody.

Q.  Even in the sense of if, you know, if you get on the stand or if you do something, I'm not going to be able to represent you effectively?  Not that you want to withdraw, but just not going to be able to represent you, do as good a job as I could?

A.  I just don't recall that and it doesn't sound like something I would say and I don't know why I would say that.

. . . .

Except that gets, that got confused with some hypothetical I was giving him about what would happen if there was perjurious testimony, but we hadn't even got to that, what his testimony's going to be, yet.

Q.  And, again, so you hadn't, that wouldn't have been said because y'all never even got there at all?

A.  Never got to the point where I recommended that he would testify or not. Certainly, we had some problems.

Q.  And you heard both of them [Petitioner and his wife] has [sic] testified that that conver—not in the sense of because of perj—, you know, them perjuring, him perjuring himself on the stand, but they did basically say that you couldn't represent him anymore.  I mean, kind of words that you're saying, but for different reasons.  And you don't have, and your notes don't reflect where that would have come from?

A.  No.

(Ex. C at 293–315).

At the evidentiary hearing, Petitioner admitted he told Mr. Komarek he would take the ten-year plea offer (*id.* at 221).  However, he testified he subsequently changed his mind and decided he wanted to testify (*id.*).  He stated:

A [by Petitioner].  Sunday I called him back.  I decided I'm not going to take this plea.  I've thought about it Saturday night and I decided I don't want to do this.

. . . .

So I called him back up and I told him.  And he kind of got mad, you know, kind of went off and got angry with me about saying, you know, this would be, you know, it's for my best interest.  And then he—I told him I wanted to testify, and then he said, well, I don't know if I can defend you.  And then he told me that he was trying to save my life and keep me from dying in prison.

. . . .

And, and that kind of, I kind of thought after that he'd kind of give up [sic]. I mean, I didn't know if he was going to withdraw on me or, you know.  The can't [sic], can't defend me, I didn't know if that meant I didn't have a defense, he was, he was pulling out on me.  I felt like he wasn't my advocate anymore.

Q.  Okay.  Did he ever explain what he meant by "I can't defend you?"

A.  No, sir.

. . . .

Q.  All right.  So what happens then?

A.  Well, it depends on, you know—I mean, I'd been shot and I'd already been through the experience of almost dying, you know, so it was like this was happening again.  So versus dying in prison or taking ten years, I decided to go with the plea.

(Ex. C at 222–24).

Petitioner has not identified clear and convincing evidence that rebuts the state court's finding that Mr. Komarek credibly testified he never told Petitioner he would withdraw from the case if Petitioner elected to testify, and that Komarek believed that Petitioner was confused about a hypothetical situation regarding Petitioner testifying truthfully and not committing perjury. Therefore, Petitioner failed to demonstrate his plea was the result of counsel's threat to withdraw or otherwise abandon the case.

Moreover, Petitioner's statements during the plea colloquy contradict his allegations of threats or coercion by counsel:

THE COURT:  Mr. Granberry, you understand you don't have to enter a plea to either, any of the 3 of these charges.  As to all of these charges you have the right to go to a trial.  That trial would be before a jury, be here [sic] in Jackson County. You would be represented by your attorney at that trial who would call any witnesses you wanted him to call.  You would cross-examine the State's witnesses.  You understand you have a right to remain silent and unless the State could prove these charges to the jury beyond a reasonable doubt the charges would be dismissed.  Do you understand all of those rights?

THE DEFENDANT:  Yes, sir, Judge McClellan, I understand.

THE COURT:  Do you understand you give up all those rights by entering a plea?

THE DEFENDANT:  Yes, sir.

THE COURT:  Is that what you want to do?

THE DEFENDANT:  Yes, sir.

THE COURT:  You also understand, Mr. Granberry, by entering a plea you give up the right to appeal any issues regarding these charges even the issue regarding guilt and innocence?

THE DEFENDANT:  Yes, sir.

THE COURT:  Is that what you want to do?

THE DEFENDANT:  Yes, sir.

THE COURT:  Have you had enough time to discuss your case with Mr. Komarek?

THE DEFENDANT:  Yes, sir.

THE COURT:  Are you satisfied with his services?

THE DEFENDANT:  Yes, sir, I am.

THE COURT:  Mr. Granberry, are you under the influence of any drugs or alcohol?

THE DEFENDANT:  No, sir.

THE COURT: Are you having any difficult[y] hearing or understanding what is going on?

THE DEFENDANT:  No, sir.

THE COURT:  Has anybody promised you or threatened you in any way to get you to enter this plea?

THE DEFENDANT:  No, sir.

THE COURT:  Has anybody, including your attorney, Mr. Komarek, promised you that with respect to the prison sentence you would do anything less than the full ten years?

THE DEFENDANT:  No, sir.

> THE COURT:  And is there anything about the agreement you made with the State, the proposed sentence or anything else concerning these proceedings, that you do not understand?
>
> THE DEFENDANT:  No, sir, I understand.
>
> THE COURT:  Do you have any questions at all?
>
> THE DEFENDANT:  No, sir, I don't have any questions.

(Ex. C at 363–65) (emphasis added).  Additionally, by signing the written plea agreement, Petitioner acknowledged that his plea was entered of his own free will, and no one forced, threatened, persuaded, promised, induced or otherwise influenced him to enter his plea, except as set forth in the agreement (*id.* at 358).

In light of the court's determination that Mr. Komarek did <u>not</u> tell Petitioner he would withdraw from the case if Petitioner elected to testify, and considering Petitioner's on-the-record statements during the plea colloquy that no one threatened him in any way to cause him to accept the plea, Petitioner failed to demonstrate deficient performance by counsel. Therefore, the state court's adjudication of Ground One, sub-claim 1-C is entitled to deference.

> D.    <u>Ground One, sub-claim 1-D:  "Petitioner's plea was not voluntarily and intelligently made due to: . . . defense counsel's failure to bring to the court's attention Petitioner's serious mental health disorders:  post-traumatic stress disorder(s) and manic depressive disorders."</u>

Petitioner contends defense counsel was ineffective for failing to advise the trial court that there was a reasonable probability Petitioner was incompetent to proceed due to his serious mental health disorders, including post-traumatic stress disorder and manic depression, and the effects of medications Petitioner was taking for these disorders, including Lexapro and Xanax (doc. 1 at 6, 10–12).  Petitioner states counsel knew he had been diagnosed with these mental disorders and that he was taking medication prior to and during the plea hearing, but counsel failed to investigate how the disorders and medication could affect Petitioner's judgment and reasoning (*id.* at 11).  He states if counsel had made such investigation, he would have discovered there was a presumption that Petitioner was not competent to assist in his defense or proceed to trial (*id.* at 11–12).  Petitioner further contends if counsel had brought this information to the court's attention, the court would not

have accepted the plea and would have been required to appoint an expert to evaluate Petitioner's competency (*id.* at 12).

Respondent asserts Petitioner failed to properly exhaust this claim, because he did not present it in his brief to the state appellate court on appeal of the lower court's denial of his Rule 3.850 motion (doc. 22 at 21). Respondent contends Petitioner may no longer return to state court to litigate this claim; therefore, the claim is procedurally barred from federal review (*id.*). Respondent additionally argues notwithstanding the exhaustion issue, Petitioner's claim is without merit (*id.* at 21–22).

In response to the exhaustion argument, Petitioner states he raised this claim in Issue 1 of his Rule 3.850 motion (doc. 25 at 16).

The record supports Respondent's argument. The Florida Rules of Appellate procedure provide that in a case where a movant's Rule 3.850 motion is denied after an evidentiary hearing, a movant wishing to appeal the denial of his motion must file an initial brief. *See* Fla. R. App. P. 9.141(b)(3); *see also* Pennington v. State, 34 So. 3d 151, 153 at n.1 (Fla. 1st DCA 2010) (briefing is required in appeal from non-summary denial of Rule 3.850 motion). It is well established in Florida courts that claims for which an appellant has not presented any argument, or for which he provides only conclusory argument, are insufficiently presented for review and are waived. *See* Gamble v. State, 877 So. 2d 706 (Fla. 2004); Reed v. State, 875 So. 2d 415 (Fla. 2004) (same); Cooper v. State, 856 So. 2d 969, 977 n.7 (Fla. 2003); Marshall v. State, 854 So. 2d 1235, 1252 (Fla. 2003) Sweet v. State, 810 So. 2d 854, 870 (Fla. 2002); Johnson v. State, 769 So. 2d 990, 1005–06 (Fla. 2000); Shere v. State, 742 So. 2d 215, 217 n.6 (Fla. 1999). The undersigned thus concludes that the Florida procedural rule deeming as waived or abandoned those claims for which an appellant has not presented any argument in his appellate brief (or for which he provides only conclusory argument), is a firmly established and regularly followed procedural rule for purposes of federal habeas.

In Petitioner's brief on appeal of the circuit court's denial of his Rule 3.850 motion, Petitioner argued in Issue 1 that his plea was involuntary due to defense counsel's misadvice as to the probable sentence he would receive if he was convicted at trial (Ex. E at 16–24). Petitioner

argued that based upon counsel's misadvice and Petitioner's "mental state," Petitioner felt it was in his best interest to accept the plea and waive his right to appeal the issue raised in defense counsel's motion to suppress (*id.* at 17–18). This was the only mention of Petitioner's alleged mental disorder in the entirety of his appellate argument on Issue 1. Nowhere in Petitioner's appellate brief did he argue that defense counsel was ineffective for failing to raise a mental competency issue with the trial court, based upon Petitioner's alleged mental heath disorders and the influence of his medications. Therefore, Petitioner did not properly exhaust this claim in the state courts.[9]

---

[9] This rule applies notwithstanding Petitioner's argument that the state circuit court essentially summarily denied this claim. When a defendant receives an evidentiary hearing on any post-conviction claim, he must present argument on all issues for which he seeks appellate review in his initial brief, regardless of whether the claim was summarily denied or litigated at the evidentiary. *See* Prince v. State, 40 So. 3d 11 (Fla. 4th DCA 2010); Hammond v. State, 34 So. 3d 58 (Fla. 4th DCA 2010) (claim for which appellant did not present argument, or for which he provided only conclusory argument, was insufficiently presented for appellate review, regardless of whether claim was among those claims litigated at evidentiary hearing or among those claims summarily denied by trial court); Williams v. State, 24 So. 3d 1252 (Fla. 1st DCA 2009) (where appellant received evidentiary hearing on some of his post-conviction claims and others were summarily denied, appellate court would review only those summarily denied claims which movant argued in appellate brief); *see also* Ward v. State, 19 So. 3d 1060, 1061 (Fla. 5th DCA 2009) (en banc) (where all of appellant's post-conviction claims were summarily denied, but appellant chose to file initial brief on appeal (even though not required to do so under Fla R. App. P. 9.141(b)(2)), appellant abandoned any issues not addressed in initial brief); Watson v. State, 975 So. 2d 572 (Fla. 1st DCA 2008) (same); Austin v. State, 968 So. 2d 1049 (Fla. 5th DCA 2007) (same); *but see* Norwood v. State, 30 So. 3d 336 (Fla. 2d DCA 2010) (not applying rule in pro se cases and recognizing conflict with Hammond, Williams, Ward, Watson, and Austin, *supra*); Walton v. State, — So. 3d —, 2010 WL 1507628 (Fla. 2d DCA 2010) (same). While there has not been absolute consistency by Florida district courts of appeal in applying this rule, such is not required to permit a federal court to conclude that a state procedural rule is adequate for federal habeas purposes. *See* Maples v. Allen, 586 F.3d 879, 888 (11th Cir. 2009) (while "regularly followed" means "closely hewn to," it does not mean complete unanimity or absolute consistency of state decisions applying the rule) (citations omitted).

Therefore, the Florida procedural rule deeming as waived or abandoned those claims for which an appellant has not presented any argument in his initial brief, even when the post-conviction evidentiary hearing was limited in scope to some but not all post-conviction claims and the appellant's insufficiently presented claims were summarily denied by the trial court, is a firmly established and regularly followed procedural rule for purposes of federal habeas. *See, e.g.*, Daniels v. Tucker, No. 5:09cv328/RS/EMT, 2011 WL 7153921, at *18 (N.D. Fla. Nov. 22, 2011) (unpublished), *Report and Recommendation adopted*, 2012 WL 379590 (N.D. Fla. Feb. 3, 2012) (unpublished); Stoudmire v. Tucker, No. 3:09cv48/MCR/EMT, 2011 WL 5426239, at *9–11 (N.D. Fla. Aug. 30, 2011), *Report and Recommendation adopted*, 2011 WL 5442091 (N.D. Fla. Nov. 9, 2011) (unpublished); Green v. McNeil, No. 1:09cv204/MMP/GRJ, 2011 WL 2790167, at *7 (N.D. Fla. June 22, 2011) (unpublished), *Report and Recommendation adopted*, 2011 WL 2790180 (N.D. Fla. July 15, 2011); Curry v. Buss, No. 3:08cv539/LAC/EMT, 2011 WL 2174038 (N.D. Fla. Apr. 26, 2011) (unpublished), *Report and Recommendation adopted*, 2011 WL 2149544 (N.D. Fla. June 1, 2011); Rasley v. Buss, No. 5:08cv368/RH/EMT, 2011 WL 2358650 (N.D. Fla. Apr. 11, 2011) (unpublished), *Report and Recommendation adopted*, 2011 WL 2293383 (N.D. Fla. June 9, 2011); Corn v. McNeil, No. 3:08cv199/MCR/EMT, 2010 WL 5811343 (N.D. Fla. Nov. 24, 2010) (unpublished), *Report and Recommendation adopted*, 2011 WL 88713 (N.D. Fla. Feb. 10, 2011); Ross v. McNeil, 5:07cv219/RS/EMT, 2010 WL 2179039 (N.D. Fla. Apr. 14, 2010) (unpublished), *Report and Recommendation adopted*, 2010 WL 2179037 (N.D. Fla. May 28, 2010) (unpublished), *cert. of appealability denied*, No. 10-13013-A (11th Cir. Oct. 4, 2010) (certificate of appealability sought

Moreover, Petitioner cannot now take a second appeal from the denial of his Rule 3.850 motion to attempt to successfully exhaust the claim presented in sub-claim 1-D; therefore, the claim is considered procedurally defaulted.

Petitioner appears to allege ineffective assistance of post-conviction appellate counsel as cause for his failure to raise this claim in his brief on appeal in the Rule 3.850 proceeding (*see* doc. 26 at 19).  He alleges he raised a claim of ineffective assistance of post-conviction appellate counsel in a state habeas petition (*id.*).  The state court record confirms that Petitioner raised several claims of ineffective assistance of post-conviction appellate counsel, including appellate counsel's failure to raise this issue in the post-conviction appeal, in his state habeas petition (Ex. M at 1, 3, 16–18, 21–22).  However, ineffective assistance of counsel on appeal of a collateral proceeding does not constitute cause to overcome a procedural bar.  *See* Coleman v. Thompson, 501 U.S. 722, 752–53, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *see also* Martinez v. Ryan, — S. Ct. —, 2012 WL 912950, at *10 (2012) (ineffective assistance of counsel can constitute cause of a procedural default in an initial-review collateral proceeding, but not an appeal from an initial-review collateral proceeding).  Therefore, Petitioner failed to demonstrate cause for the procedural default.  Further, he has failed to demonstrate he is entitled to federal review of this claim through any other recognized exception to the procedural bar.  Therefore, Ground One, sub-claim 1-D is procedurally barred from federal review.

> E.    Ground One, sub-claim 1-E:  "Defense counsel was ineffective for allowing the Petitioner to waive his appeal rights and by not making a timely objection to the waiver.  Trial court renditions of Petitioner's waiver of right to appeal, not specifically made."

Petitioner contends the trial court committed reversible error by accepting Petitioner's waiver of his right to appeal, and defense counsel was ineffective for failing to object to Petitioner's wavier (doc. 1 at 6, 12–13).  Petitioner specifically argues the trial court failed to verify on the record that Petitioner understood he was waiving his right to appeal the trial court's denial of defense counsel's motion to suppress (*id.*).  Petitioner further argues the trial court made contradictory statements

---

on issue of whether Florida's procedural rule, that defendant waived or abandoned appellate review of post-conviction claims that were summarily denied and not addressed in defendant's appellate brief, where trial court held evidentiary hearing on other claims, was firmly established and regularly followed).

regarding Petitioner's appellate rights, which confused him as to what his appellate rights were (*id.* at 13). Petitioner contends the waiver of his appellate rights was thus not knowing and voluntary (*id.* at 12–13). He asserts if defense counsel or the court had properly informed him of the appellate rights he was waiving, he would not have entered a plea and instead would have insisted on going to trial (*id.* at 13). Petitioner asserts he raised this claim in his Rule 3.850 motion (doc. 1 at 13).

Respondent contends this claim, whether construed as a claim of trial court error or ineffective assistance of counsel or both, is unexhausted and procedurally defaulted (doc. 22 at 22–24). Respondent argues to the extent Petitioner raises a claim of trial court error, he failed to preserve the issue by presenting it in a motion to withdraw his plea, as required by Rule 9.140(b)(2)(A)(ii)c. of the Florida Rules of Appellate Procedure (*id.* at 22–23). Further, Petitioner did not even file a direct appeal, which was the proper vehicle for raising a claim of trial court error (*id.* at 23). Moreover, in Petitioner's Rule 3.850 proceeding, he did not raise a claim of trial court error with respect to the court's acceptance of his waiver of his appellate rights; nor did Petitioner raise a claim of ineffective assistance of counsel based upon counsel's failure to object to the waiver of Petitioner's right to appeal the suppression issue or otherwise attempt to preserve his right to appeal this issue (*id.* at 22–23). Therefore, the claims are procedurally barred from federal review (*id.*).

In Petitioner's reply, he clarifies his claim as one of trial court error, that is, the trial court's failure to specifically inform him he was waiving his right to appeal the suppression issue by entering his plea. Petitioner contends the trial court's failure to clarify his appellate rights rendered his plea unknowing and involuntary (doc. 26 at 20–22).

Review of the state court record demonstrates that as part of Petitioner's claim of ineffective assistance of counsel asserted in Issue 1 of his Rule 3.850 motion, Petitioner argued his appeal waiver was involuntary (Ex. D at 5–16). But he did not argue it was involuntary due to trial court error; rather, he argued defense counsel misadvised him as to the sentence he could receive if he did not accept the State's plea offer, which included waiver of his appellate rights (*id.*). He additionally argued the trial court failed to conduct a sufficient inquiry to determine the voluntariness of his appeal waiver (*id.* at 10–12). However, even if this constituted fair presentation of an independent

claim of trial court error, Petitioner did not fairly present an independent claim of trial court error on appeal of the state circuit court's denial of the motion.  On appeal of the state circuit court's denial of Issue 1, Petitioner's post-conviction appellate counsel argued the unknowing and involuntary nature of the appeal waiver only in the context of the argument that Petitioner was prejudiced by trial counsel's misadvice regarding the possible length of his sentence if he rejected the plea offer (Ex. E at 17–18, 23–24).  He did not argue error with respect to the sufficiency of the trial court's colloquy.  Therefore, Petitioner did not give the post-conviction appellate court an opportunity to pass upon and correct any constitutional error with respect to the trial court's acceptance of the plea.  Therefore, Petitioner procedurally defaulted his claim of trial court error.

To the extent Petitioner argues ineffective assistance of post-conviction appellate counsel as cause for his failure to exhaust the claim of trial court error in his post-conviction appeal (Petitioner raised this claim of ineffective assistance of post-conviction appellate counsel in his state habeas petition (see Ex. M at 1, 3, 18–22)), as discussed supra, ineffective assistance of counsel in an appeal from an initial-review collateral proceeding does not constitute cause to overcome a procedural bar. Therefore, Petitioner is not entitled to federal review of Ground One, sub-claim 1-E.

Moreover, Petitioner's argument that defense counsel performed ineffectively by failing to object to the trial court's acceptance of Petitioner's appeal waiver without reserving the right to appeal the suppression issue is without merit.  Defense counsel testified at the evidentiary hearing regarding his conversations with Petitioner regarding whether the plea agreement included preservation of the right to appeal the suppression issue:

> A [by Mr. Komarek]. . . . Right after that [Mr. Komarek's initial conversation with the prosecutor during which the prosecutor offered fifteen (15) years of imprisonment] I called Mr. Granberry about the plea offer.  I conveyed it to him, fifteen years with a three-year minimum mandatory.  I think he was thinking about it. . . .
>
> . . . .
>
> . . . I explain [sic] to him that he's got thirty, thirty years on the trafficking charge, thirty on the conspiracy to traffic and the paraphernalia, so basically, sixty-one years if you add them all together, that eight-five percent of the time is what he would be doing.  He's only got one ground to appeal right now and that would be the search warrant.  There must have been some discussion about how to preserve that issue because you [the prosecutor] wouldn't take a plea where he could preserve it.

And we discussed, or I told him about pleading straight up, just pleading to the charges and say that we wanted to preserve the appeal and, if we were allowed to do that by the judge, then that might work.

Q.  That would be pleading straight up to the Court with no plea agreement with the State?

A.  Right, and if the—yeah, right.  And, of course, announcing to the Court that that was based upon or conditioned upon him being able to preserve his right to appeal.  And it might work and it might not.  And I explained to him, after conversations with you . . . [i]f we could get ten years and do the deal, he'll do it.  That's when he told me about being shot bothered him on his left side, post-traumatic stress, medications.  He's taking medications:  Xanex and Lexapro and his blood pressure medication and so forth.  But he didn't give any indication that it affected him.

Now, I'm jumping from the 23rd back to the 24th again on my notes.  That's where I talked to him and he indicates that he'll plead ten years, same probation Richter got, the fines and so forth.  And he says okay, or at least my notes indicate that he confirmed that he would do that.  It was all rather non-specific in detail because we're going back and forth and everything is not mentioned every time, because we're assuming at that point that it's going to be basically the same thing that Richter got and that you wouldn't, you wouldn't allow him to preserve his right to appeal.

. . . .

So, to the best of my knowledge, when we went in Monday morning, he knew what the deal was.

(Ex. C at 293–95).

At the evidentiary hearing, Petitioner testified, consistently with Mr. Komarek, that the Friday before trial, Mr. Komarek called him and communicated the prosecutor's offer of fifteen (15) years in prison and waiver of his right to appeal the suppression issue (Ex. C at 219).  Petitioner testified he rejected that offer, and told Mr. Komarek to ask the prosecutor if he would agree to ten (10) years of imprisonment (*id.* at 220).  Petitioner testified Mr. Komarek called him back on Saturday, and stated the prosecutor agreed to ten years of imprisonment, but only if Petitioner agreed to waive his right to appeal the suppression issue (*id.*).  Petitioner testified he told Mr. Komarek he would accept that offer, and asked that Komarek confirm it with the prosecutor (*id.* at 220–21).  Petitioner testified Mr. Komarek called him and confirmed the plea agreement (*id.* at 221).  He testified he understood

that waiving his right to appeal the suppression issue was part of the ten-year plea agreement (*id.* at 239–40).

The written plea agreement, signed by Petitioner and Mr. Komarek, expressly provided that the plea was being made "without reservation of the right to appeal the judgment of the Court, including guilt or innocence" and that Petitioner would not be entitled to the services of a public defender for any appeal "other than an appeal based upon an illegal sentence" (Ex. C at 358). At the plea and sentencing hearing, the trial court asked Petitioner whether he understood he was giving up the right to appeal "any issues regarding these charges, even the issue regarding guilt and innocence," and Petitioner responded he understood (*id.* at 364). There is nothing in the record to suggest Petitioner's counsel misadvised Petitioner that the plea deal preserved his right to appeal the suppression issue; nor has Petitioner shown that counsel had reasonable grounds to object to the waiver of Petitioner's right to appeal the suppression issue or otherwise attempt to preserve Petitioner's right to appeal the suppression issue at the plea hearing. Therefore, Petitioner failed to show counsel performed ineffectively in this regard.

> F.    Ground Two: "Petitioner's constitutional rights under the Fourth (4th), Fifth (5th), Sixth (6th), and Fourteenth (14th) Amendments were violated by the lower state courts and: (1) resulted in a decision that was contrary to *Franks v. Delaware*, 438 U.S. 154 (1978); (2) resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."

> Ground Three: "Petitioner's constitutional rights under the Fourth (4th), Fifth (5th), Sixth (6th), and Fourteenth (14th) Amendments were violated by the state lower court's/trial court's ruling that denied Petitioner's ineffective assistance of counsel claim was based on an unreasonable determination of facts in light of the evidence presented at the petitioner's evidentiary hearing, and is contrary to clearly established federal law."

Petitioner asserts prior to entering his guilty plea, the trial court held a hearing on defense counsel's motion to suppress evidence obtained as a result of Petitioner's arrest, on the ground that the arrest was unlawful, because it was not supported by probable cause (doc. 1 at 14–18). In Ground Two, Petitioner alleges it became evident at the suppression hearing that Sergeant Edmondson, the officer who submitted the probable cause affidavit, knowingly included a false statement in the affidavit, that is, that he actually saw Petitioner harvesting marijuana (*id.* at 16). Petitioner contends defense counsel was ineffective for failing to argue that Sergeant Edmondson's

false statement in the affidavit constituted a basis for suppressing evidence obtained during the course of his arrest, pursuant to Franks v. Delaware, 438 U.S. 154 (1978) (*id.* at 16–18).  In Ground Three, Petitioner contends trial counsel was ineffective for failing to question Lieutenant Watson as to how he was able to see Petitioner and his co-defendant standing near a marijuana plant, when Watson and Sergeant Edwards were crawling or kneeling in dense underbrush (*id.* at 20–22). Petitioner states Sergeant Edwards, who was with Lieutenant Watson in the underbrush, testified he could not see Petitioner until Petitioner was within 2–3 feet of him (*id.*).  Petitioner argues defense counsel should have impeached Lieutenant Watson with this inconsistency and argued to the court that Watson was not able to observe or hear anything while he was in the underbrush (*id.*).

Petitioner states he raised both of these claims in Issue 2 of his Rule 3.850 motion (*see* doc. 1 at 19, 23; doc. 26 at 22, 25).

Respondent construes Petitioner's argument in Ground Two as asserting trial court error with respect to the denial of the motion to suppress and contends the claim is not cognizable, pursuant to Stone v. Powell, 428 U.S. 465 (1976), because Petitioner had a full and fair opportunity to litigate the Fourth Amendment issue in the state courts (doc. 22 at 24–25).  Respondent additionally contends the claim is unexhausted and procedurally defaulted, because Petitioner failed to seek review of the Fourth Amendment claim on direct appeal (*id.* at 25).  As to Ground Three, Respondent contends Petitioner failed to demonstrate that the state court's adjudication of the claim was contrary to or an unreasonable application of Strickland (*id.* at 25–29).

In Petitioner's reply, he argues Stone v. Powell, *supra*, does not extend to his claim of ineffective assistance of counsel based upon counsel's failure to argue the seizure of evidence was void under Franks v. Delaware, 438 U.S. 154 (1978) (doc. 26 at 23–24).  Petitioner asserts he has included argument on the merits of the Fourth Amendment issue only to establish Strickland prejudice (*id.*).

With regard to Ground Two, in light of Petitioner's clarification that he is raising only a claim of ineffective assistance of counsel with respect to counsel's performance at the suppression hearing, not an independent Fourth Amendment claim, the undersigned concludes the claim is not barred by Stone v. Powell, 428 U.S. 465, 494, 96 S. Ct. 3037, 3052, 49 L. Ed. 2d 1067 (1976).

Further, it is evident from the record that the state court adjudicated both claims of ineffective assistance of counsel asserted in Grounds Two and Three. Therefore, the court will assess whether Petitioner has demonstrated he is entitled to relief on these claims of ineffective assistance of counsel.

        1.      Clearly Established Federal Law

The clearly established law governing this claim is set forth *supra*.

        2.      Federal Review of State Court Decision

Petitioner raised these claims as Issues 2 and 3 in his Rule 3.850 motion (Ex. D at 17–24, 322–24). The state circuit court adjudicated the claims as follows:

> In claim two, Defendant alleges that counsel was ineffective when he failed to challenge the sufficiency of the probable cause that resulted in his arrest, in the face of conflicting statements by the witnesses who were used to establish probable cause. Defendant's claim is without merit. Counsel did challenge the sufficiency of the probable cause based on this precise issue through a Motion to Suppress Evidence filed April 26, 2004. *See TR Motion Hearing held October 20, 204, pgs. 10–16*. However, the issues raised by Defendant's counsel were overruled by the Court by an order filed October 21, 2004. Therefore, Defendant has failed to establish prejudice pursuant to *Strickland*.
>
> In claim three, Defendant alleges that counsel failed to advise the Court that fraudulent representations had been used in order to procure the warrant for Defendant's arrest. Simply put, Defendant submits that the probable cause affidavit, written by David W. Edmondson, reflects that investigators observed two individuals as they began to collect marijuana buds from several of the plants. *See Defendant's Motion filed February 13, 2007, pg. 2*. However, Defendant claims that the officers['] testimony during depositions conflicted with their earlier statements that they observed and/or saw the Defendant collect marijuana buds. Based upon the foregoing, Defendant asserts that his trial counsel should have argued to the Court during the suppression hearing that the officers perpetrated a fraud through the probable cause affidavit.
>
> During the suppression hearing held October 20, 2004, Defendant's trial counsel challenged the sufficiency of the probable cause that resulted in Defendant's arrest as submitted in claim two above. In his argument, counsel brought to the attention of the court the inconsistent statements made by officers during their depositions about observing the defendants prior to being arrested. In fact, counsel brought to the Court's attention some of the officer's testimony during depositions

to demonstrate the inconsistent statements made by the witnesses, which conflicted with their earlier ones. *See TR Motion Hearing held October 20, 2004, pgs. 10–16.*

At the evidentiary hearing, Defendant's counsel stated that he vigorously argued the motion to suppress; however, the Court ruled against his client. In regards to the falsity of the probable cause affidavit, counsel does not remember and the record does not show otherwise. Despite the foregoing, a defendant's right to reasonable competent counsel does not entitle him to have every conceivable challenge pressed upon the Court. *See Magill v. State*, 457 So. 2d 1367 (Fla. 1984).

The standard for evaluating counsel's performance is that of "reasonable effective counsel." *See Strickland*, 104 S. Ct. at 2052; *Miller v. State*, 921 So. 2d 816, 819 (Fla. 5th DCA 2006). Reasonable effective counsel does not mean perfect counsel, but rather is an objective standard. *See id.* Further, a defendant must show beyond mere speculation that there is a reasonable probability that but for counsel's errors the outcome of the proceeding would have been different. *See Peterka v. State*, 890 So. 2d 219, 228 (Fla. 2004). The convicted defendant bears the burden of proof for each element of the *Strickland* test, and if he is unable to satisfy either prong of the test, then relief should be denied. *See Strickland,* supra.

Applying these standards to the present case, the Court finds that the Defendant has failed to establish that counsel's performance was deficient, nor [sic] that Defendant was prejudiced by counsel's performance. Moreover, Defendant has failed to show a deficiency so substantial as to probably have affected the outcome of the proceedings. Finally, Defendant has failed to affirmatively prove prejudice.

(Ex. C at 326–27).

Petitioner argued both issues on appeal of the denial of his Rule 3.850 motion (Ex. E at 25–34). The First DCA affirmed without written opinion.

The state court record demonstrates that Petitioner's counsel, Mr. Komarek, filed a motion to suppress evidence obtained as a result of Petitioner's arrest, on the ground that Petitioner was arrested without any prior information linking him to the plots of marijuana and without the officers first observing Petitioner engaging in any criminal activity (Ex. C at 352–53). The four officers who conducted surveillance of the area where Petitioner was arrested, Investigators Arnold, Edmondson, Watson, and Edwards, testified at the evidentiary hearing on the motion to suppress (*id.* at 379–530).

Investigator Arnold testified that on September 8, 2003, he and a pilot conducted a cannabis aerial detection mission (Ex. C at 405–06). He testified he spotted what he believed to be marijuana plants in an area off Richter Road (*id.* at 406–07). Investigator Arnold testified that on October 2, 2003, he and Investigator Edmondson were conducting surveillance at the site, when he heard a vehicle enter the area and pass their location (*id.* at 409–10). He heard the vehicle doors open and close, and then open and close again (*id.* at 409). He heard the vehicle start up, come closer to their location, shut off, and then the doors open and close again (*id.*). He testified he heard brush moving and conversation (*id.*). After a few minutes, he heard the vehicle doors open and close, and the vehicle start up and come closer to his location (*id.* at 410). He again heard the vehicle shut off and the doors open (*id.*). He also heard a man ask about bags, and another person respond that they were on the front seat of the truck (*id.*). Investigator Arnold testified that after a while, the two individuals moved by him in the brush, but "as far as making anything out I could not" (*id.* at 410, 412). Arnold testified he heard brush moving and conversation between the two individuals (*id.*). He testified he was able to tell that the voices were male voices, and it appeared they were white males, but he could not decipher what they said (*id.*). Investigator Arnold testified he then heard "snipping noises" (*id.*). Investigator Arnold testified he never actually saw the individuals touch the marijuana plants, he just heard snipping noises (*id.* at 412, 414, 417–18).

Investigator Edmondson testified that beginning September 10, 2003, Investigators Arnold, Edwards, and Watson went to an area designated as Plot 1 with a surveillance camera system, and set up the camera system near marijuana plants (Ex. C at 420). He stated that sample plant material was also collected for testing (*id.*). Edmondson stated that after the camera was installed, he and the other investigators viewed the surveillance video and observed two white males cultivating two marijuana plants, and one man appeared to have a cloth or mask over his head (*id.* at 423–24, 432). He testified both men were wearing short-sleeved shirts (*id.* at 431). He stated that while he and the other officers were conducting surveillance of the site a few days prior to October 2, 2003, they observed what appeared to be pieces or buds cut off some of the plants, which they knew a couple of days earlier were intact; and they observed yellow leaves pulled off some of the plants and discarded (*id.* at 428–29). Edmondson testified that on October 2, he and Investigator Arnold were

positioned to the east of a particular trail, and Investigator Edwards and Watson were to the west of the trail (*id.* at 433).  He testified he heard a vehicle stop just to his right, and then heard men's voices (*id.* at 435).  He testified he continued to hear the men's voices as they got closer and then passed him and Investigator Arnold (*id.*).  Edmondson testified he called Investigator Edwards on the radio and told him the men were heading towards Edwards and Watson (*id.* at 435–36).  Edmondson continued to hear brush breaking, voices, and "clipping noises" (*id.* at 436, 446).  He testified as he was talking with Edwards on the radio, Edwards said, "They're coming up on our position" (*id.* at 436–37).  Edmondson testified he responded, "Okay.  Well, you know, need to get ready to apprehend them if they come to the plants near you." (*id.* at 437).

On cross-examination, Mr. Komarek questioned Investigator Edmondson regarding whether Investigator Edwards told him he actually saw two white males (Ex. C at 446).  Edmondson answered:

> At one point, yes, sir, I believe he told me that he could see two white males or either he was trying to tell me it's two white males.  I don't recall exactly the word he used.  I want to say he told me, "It's two white males" or "I see two white males."

(*id.*).  Edmondson admitted he did not actually see Petitioner or his co-defendant do anything illegal, but he "could hear what was going on" (*id.* at 448).  Mr. Komarek's questioning continued:

> Q.  In your complaint you say the evidence [sic] "As they began to harvest buds from several marijuana plants," is that a statement that you made under oath based upon what you testified here today to?
>
> A.  Is what I testified to back in my deposition [sic].  I don't remember the exactly [sic] language Investigator Edwards told me on the radio.  I don't recall if he told me he saw them or not, I want to say he did but I can't swear to it a hundred percent or he was telling me, "They're two white male [sic]."  "Go ahead and apprehend them, we heard the clipping noises" and knew they were walking around in Plot 2 and the truck was driving around the area between Plot 3 and 4. . . . We had surveillance camera tape from past dates, we knew at least on one occasion two people had been out there before.

(*id.* at 448).

Investigator Watson testified he was positioned with Investigator Edwards (Ex. C at 467).  He testified he heard a vehicle come close to their position, and then heard a door closing and someone entering the wooded area to the left of him and Edwards (*id.*).  Watson testified he heard

voices and people moving to the left, but he and Edwards were not able to see at that time (*id.*).  He testified they heard "snips or clicking" (*id.* at 467–68).  Watson testified the sounds were significant, because when investigators arrived at the plots on earlier occasions, marijuana bushes had been snipped or picked, so when he heard snipping, he believed the individuals were snipping buds off the marijuana plants (*id.* at 468).  He testified he and Investigator Edwards were twenty (20) feet from a marijuana plant, and he heard the individuals approach the plant (*id.* at 469–70).  He testified there was a pine tree and a marijuana plant between the individuals and him and Edwards, but "you could sort of see through the branches and the marijuana plant on the other side," and he saw clothing (*id.* at 469, 473).  Watson testified he heard one of the individuals say, "They sure are pretty," and at that time Investigator Edwards moved in front of him and approached Petitioner, shouting, "Sheriff's Office, get down" (*id.* at 470–71, 476).  Watson testified he initially began to follow Edwards, but saw the co-defendant move to his (Watson's) left, so he shifted to the left and monitored the co-defendant (*id.*).

On cross-examination by Mr. Komarek, Investigator Watson testified he never saw Petitioner or his co-defendant touch a marijuana plant, he just saw them near a plant and heard the clipping sounds (Ex. C at 475, 481).

Investigator Edwards testified that based upon their previous surveillance activities of the plots, including a video, the investigators believed that the persons cultivating the marijuana plants were two white males (Ex. C at 486–87).  He testified on the day in question, he heard a vehicle approach the area where he and Investigator Watson were positioned, and he heard two doors slam and people talking (*id.* at 487–88).  He testified as the two people walked near his position, he determined they were white males, because he heard two white male voices (*id.* at 488, 490).  He testified he heard the persons walking through the brush, and he heard clipping noises (*id.* at 489, 505).

On cross-examination by Mr. Komarek, Investigator Edwards testified he and Investigator Watson were in kneeling or crawling positions when the individuals were approaching their position (Ex. C at 494).  He testified Petitioner was two or three feet from him when he (Edwards) jumped

up and pointed his weapon at Petitioner (*id.* at 495).  Edwards admitted he did not see Petitioner

touch a marijuana plant (*id.* at 497, 501).

Mr. Komarek argued there were no facts developed by the investigators prior to Petitioner's

arrest that would indicate that Petitioner had committed a crime (Ex. C at 387–97, 527–28).  Mr.

Komarek argued none of the investigators observed Petitioner do anything (*id.*).  He argued the

depositions of the four investigators, which were filed with the court, were inconsistent in several

respects, but were consistent on the fact that none of the investigators actually saw Petitioner commit

an illegal act (*id.* at 391–92, 531–721).  Mr. Komarek argued Investigator Edmondson's probable

cause affidavit stated investigators observed two individuals begin to harvest buds from marijuana

plants, but the investigators stated in their depositions that none of them actually saw this (*id.* at

392–93).

The trial court adjudicated the suppression issue as follows:

> This case began when officers of the Jackson County Drug Task Force
> spotted marijuana plants growing in or near planted pines in northwest Jackson
> County.  The officers entered the area on foot, located the plants, took samples of
> them, and set up a video camera where it could record activity around some plants
> in what was designated Plot 1.  After retrieving the video, the officers could see that
> on September 15, 2003 at approximately 6:25 P.M. and again on September 18, 2003
> at about 6:14 P.M., the plants were visited by two white males wearing short sleeve
> shirts and at least one wearing a mask or mosquito netting over his face.  No further
> identity was possible from the video, but it was clear from the video that the two
> males were tending and harvesting marijuana.  The officers set up on the plants for
> a number of days without incident.  From their inspection of the plants the officers
> could tell buds were being harvested by being clipped off the plants.

> On Oct. 2, 2004, four officers (Edwards, Watson, Arnold and Edmonson
> [sic]) set up in two locations on Plot 1.  At approximately 5:00 P.M. they heard a
> vehicle come off Richter Road and go past their location to a site near an area of
> plants called Plot 2, where it stopped and the engine was turned off.  After a time,
> they heard the vehicle start up, move closer to them, stop and shut down.  They heard
> doors open, and close.  After a few minutes they again heard doors open and close,
> the vehicle start up and move closer to their location.  Again they heard the vehicle
> doors open and then heard communications between the individuals.  One of the
> deputies heard an individual ask about bags and being told by another that they were
> on the left front seat of the truck.  The individuals were talking as they walked near
> the officers and entered into the woods.  The officers could tell there were two

individuals, and believed them to be white males from the sound of their voices. The officers knew there were marijuana plants in the area where the defendants were, and the officers heard noises they believed to be clipping noises consistent with cutting buds off the plants. As the defendants came to the plants near officers Edwards and Watson, Watson heard one of them saying, "They sure are pretty."

When immediately afterwards the defendants happened up on [sic] officers Edwards and Watson, those officers jumped up and shouted "sheriffs office, get on the ground" or words to that effect. Officers Edmonson [sic] and Arnold then joined Watson and Edwards. At that time, the officers could observe the defendants were two white males in short sleeve shirts, each wearing a mosquito netting mask over his face. Defendant Richter was observed to have in his possession a plastic bag (later determined to contain harvested marijuana) and a pair of scissors. Defendant Granberry had a pair of wire snips. Defendant Richter complied almost immediately with the direction to get on the ground and was cuffed and arrested. Defendant Granberry did not comply immediately and was shot by Edwards prior to being cuffed and arrested.

The issue presented by the Motion to Suppress is whether, on the above facts, the officers had probable cause to arrest these defendants. Probable cause is defined as "a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious person in believing the accused to be guilty." Trivette v. State, 244 So. 2d 173 (Fla. 4th DCA 1971). Probable cause to arrest exists where a reasonable person, having the specializd training of a police officer in reviewing facts known to the arresting officer prior to the actual time of arrest, would come to the conclusion that a crime is being or has been committed by the person to be arrested. Skelton v. State, 349 So. 2d 193 (Fla. 3d DCA 1977).

Defendants argue that the officers in this case acted prematurely in effecting the arrest since the officers had not actually observed the defendants harvesting or tending to the plants. This argument ignores the myriad [of] circumstances leading up to the arrest that were known to the officers. This is not a case where the defendants were merely in proximity to the plants. The officers knew that a crime had been and was being committed because they knew the plants were being actively tended and harvested. Given the similarities between these defendants (race, gender, number, and mode of dress) and the persons viewed previously on the video, together with the behavior of the defendants, their statements, and the implements in their possession, these officers had more than a mere suspicion that these defendants were committing a crime. The officers had probable cause to arrest the defendants.

(Ex. C 355–56.)

In Ground Two, Petitioner faults Mr. Komarek for not arguing <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) in support of the motion to suppress. In <u>Franks</u>, the Supreme Court held:

> . . . where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 155–56. The Supreme Court noted that probable cause may be founded on hearsay and information supplied by informants, "[b]ut surely [the affidavit] is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* at 165 (citations omitted). Allegations of either negligence or innocent mistake are insufficient to warrant relief. *Id.* at 171.

Petitioner argues Investigator Edmondson's probable cause affidavit contained the false statement that while officers were conducting surveillance of the marijuana plants,

> investigators observed two masked individuals come into the immediate area of the plants. <u>The investigators observed the two individuals as they began to collect Marijuana buds from several of the plants</u>. The defendant Edward W. Granberry Jr. was one of those two masked individuals <u>engaged in the collection of the plant material</u>. During the time the defendant and co-defendant were engaged in this activity investigators moved in to apprehend the defendants.

(Ex. C at 334) (emphasis added). Petitioner contends defense counsel should have argued that <u>Franks</u> required that the probable cause affidavit be voided and the fruits of the search excluded, due to Edmondson's statement that investigators actually observed the individuals collect plant matter.

Petitioner failed to establish a reasonable probability that the trial court would have properly granted the motion to suppress if Mr. Komarek had argued <u>Franks</u>. Reading Investigator Edmondson's affidavit as a whole (Ex. C at 334), it is clear that the information detailed therein was derived from all the investigators' surveillance and observations. Although the investigators did not visually perceive the two individuals collecting plant material, they all audibly observed such

activity.   Therefore, Investigator Edmondson's statements were "truthful" in the sense that he believed or appropriately accepted them as true.  *See* United States v. Kirk, 781 F.3d 1498, 1505 (11th Cir. 1986) (citing Franks, 438 U.S. at 164–65).  Moreover, the trial court determined that the evidence was sufficient to establish probable cause notwithstanding the fact that investigators did not visually observe the individuals collecting plant material.   Therefore, there was no basis to properly conclude that the arrest was void and evidence obtained as a result thereof subject to exclusion.  Accordingly, Petitioner failed to demonstrate Strickland prejudice as to Ground Two.

In Ground Three, Petitioner contends Mr. Komarek was ineffective for failing to impeach Investigator Watson as to how he was able to see Petitioner and his co-defendant standing near a marijuana plant, when Watson and Investigator Edwards were crawling or kneeling in dense underbrush, and Edwards testified he could not see Petitioner until Petitioner was within 2–3 feet of him.  Petitioner also faults counsel for failing to argue to the court that Investigator Watson was not able to observe or hear anything while he was in the underbrush.  However, all the investigators consistently testified they were audibly aware of the individuals' presence, because they heard movement in the underbrush and voices.  Petitioner failed to demonstrate that counsel's failure to impeach Watson with questions regarding his ability to visually observe the individuals was unreasonable.  He also failed to demonstrate a reasonable probability that the trial court would have granted the motion to suppress had defense counsel pursued such impeachment and argued to the court that Watson was not able to see or hearing anything in the underbrush.

The state court's adjudication of Grounds Two and Three was not based upon an unreasonable determination of the facts; nor was it contrary to or an unreasonable application of Strickland.  Therefore, Petitioner is not entitled to federal habeas relief on either ground.

V.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.   28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).   Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Kenneth S. Tucker is substituted for Edwin G. Buss as Respondent.

And it is respectfully **RECOMMENDED**:

1.       That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.       That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 4<u>th</u> day of May 2012.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**